**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FRIENDS OF ANIMALS
777 Post Road, Suite 205
Darien, CT 06820

        Plaintiff,

v.

AMANDA MCADAMS,
Forest Supervisor,
Modoc National Forest,
225 West 8th Street
Alturas, CA 96101

and

THE UNITED STATES FOREST SERVICE,
an agency of the United States
1400 Independence Ave, SW
Washington, D.C. 20250

        Defendants.

_____

Case No.

**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.     While Americans may not see eye to eye on whether to leave wild horses on

public lands, a vast majority of Americans do believe one thing—that wild horses should

not be wantonly killed or injured as a result of human management. Indeed, despite

initially authorizing the killing of excess wild horses in the 1971 Wild Free-Roaming Horses

and Burros Act (WHBA), since 2009, Congress has expressly denied the largest federal land

manager of wild horses, the Bureau of Land Management, the right to use public funds to

destroy wild horses.

2.     Despite these strong objections to killing wild horses, the United States

1

Complaint

Forest Service, an agency of the United States, has authorized the removal of hundreds of wild horses from public lands in California known as the Devil's Garden Plateau Wild Horse Territory (WHT). Once removed, the Forest Service intends to allow the horses to be subsequently sold "without limitations" for as little as one dollar.

3.      Sale "without limitations" would allow buyers to purchase up to 36 horses at a time. These purchased wild horses could then be sold to slaughterhouses across the world.

4.      In the past, the Forest Service followed the United States Department of the Interior's policy prohibiting the sale of wild horses to slaughterhouses, but the current administration is blatantly changing that policy.

5.      The Forest Service is proceeding with a roundup and removal of over 1,000 wild horses form the Devil's Garden Plateau WHT without first preparing new or supplemental environmental review that analyzes the new policy to sell horses without limitations.

6.      Additionally, following litigation in 2017, the 2013 Environmental Assessment that analyzes the proposed roundups at issue in this case was vacated and remanded back to the Forest Service for further analysis of its decision to remove a 23,631-acre portion of the WHT based on an "administrative error."

7.      The Forest Service never completed any new environmental review or gave the public the opportunity to comment on the current roundup or its plans to sell horses without limitation.

8.      The Forest Service's reversal of prior practice and its decision to embark on a program that may lead to the Devil's Garden Plateau wild horses being sold to slaughterhouses requires careful review under the National Environmental Policy Act (NEPA). The Forest Service did not do so and is therefore in violation of the law.

2

Complaint

9.      Accordingly, Plaintiff, Friends of Animals, brings this action on its own behalf and on behalf of its adversely affected members requesting the Court to declare the agency's decision to remove horses from the Devil's Garden Plateau WHB with the intent of placing them up for public sale "without limitation" to be arbitrary, capricious, an abuse of discretion and/or illegal pursuant to Section 706 of the Administrative Procedure Act (APA). Friends of Animals also requests that the Court enjoin the Forest Service, while vacating and remanding the decision.

## PARTIES

10.     Friends of Animals is a nonprofit, international animal advocacy organization incorporated in the state of New York since 1957. Friends of Animals has nearly 200,000 members worldwide. Friends of Animals and its members seek to free animals from cruelty and exploitation around the world, and to promote a respectful view of nonhuman, free-living and domestic animals. Friends of Animals informs its members about animal advocacy issues and its progress in addressing them through its magazine, *ActionLine*, its website, social media, and public events. Friends of Animals regularly advocate for the right of wild horses to live freely on public lands, and for more transparency and accountability in the "management" of wild horses and burros.

11.     Friends of Animals and its members have a significant interest in the wild horses in Devil's Garden Plateau WHT. For example, Friends of Animals' member and contributor Craig Downer, a wildlife biologist specializing in the study of wild horses and their habitats, has written numerous articles and books about wild horses, and has long evaluated the ramifications of the federal government's treatment of wild horse populations in the West. Mr. Downer visited and studied the Devil's Garden Plateau WHT wild horses in September 2018, and plans do so again in the near future in order to study the effects of the Forest Service's recent actions. Additionally, Friends of Animals' member

3

Complaint

Janet Schultz visits areas in and around the Modoc National Forest and is currently looking to purchase a home in the area for the specific purpose of living in an area where she can have the opportunity to view and photograph wild horses as often as possible. Ms. Schultz has toured homes in the area and has concrete plans to visit and photograph the Devil's Garden Plateau wild horses within the next week while the roundup is still taking place.

12.     Defendant, Amanda McAdams, is the Forest Supervisor for the Modoc National Forest. Devil's Garden Plateau WHT is within Modoc National Forest. As the Forest Supervisor for the Modoc National Forest, Ms. McAdams is in charge of administrating the wild horses program in the Devil's Garden Plateau WHT.

13.     Defendant, the United States Forest Service, is an agency within Department of Agriculture. The agency administers the nation's 154 national forests and 20 grasslands in 43 states, including California. Devil's Garden Plateau WHT is located on Forest Service-administered public land, and the agency is responsible for ensuring that federal-administered actions within the Devil's Garden Plateau WHT comply with the requirements of all federal laws.

## JURISDICTON AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question). This action presents a case and controversy arising under NEPA, a federal statute. This Court also has jurisdiction pursuant to 28 U.S.C. § 1346, as the United States is a defendant.

15.     This Court has authority to grant Plaintiff's requested relief pursuant to 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

4

16.     Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(e). The United States Forest Service, a federal agency in the United States Department of Agriculture (USDA), is headquartered in Washington, D.C.

## LEGAL BACKGROUND

**A.     The National Environmental Policy Act.**

17.     NEPA is our nation's basic charter for environmental protection.

18.     Congress enacted NEPA for two central purposes. First, Congress sought to ensure that all federal agencies examine the environmental impacts of their actions before acting. Second, Congress sought to provide the public with a statutory means to be informed about, and to comment on, the environmental impacts of proposed agency actions. *See* 40 C.F.R. § 1500.1. NEPA requires federal agencies to analyze the environmental impact of a particular federal action before proceeding with the action. *See* 42 U.S.C. § 4332(2)(C).

19.     Accordingly, before a federal agency can act in a way that significantly affects the quality of the human environment, NEPA requires the acting agency to prepare a detailed environmental impact statement (EIS) that discusses, among other things: "(i) the environmental impact of the proposed action; (ii) any adverse environmental effects; [and] (iii) alternatives to the proposed action." 42 U.S.C. § 4332(2)(C).

20.     The EIS is the cornerstone of NEPA. An EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). The requirement to prepare an EIS is broad and intended to compel agencies to take seriously the potential environmental consequences of a proposed action.

21.     "'Major Federal action' includes actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18.

22.     "Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals." *Id.* § 1508.18(a).

23.     Major federal action also includes "formal documents establishing an agency's policies which will result in or substantially alter agency programs," "[a]doption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive" and the "[a]pproval of specific projects" including "approv[al] by permit or other regulatory decisions as well as federal and federal assisted activities." *See id.* § 1508.18(b)(1), (3)-(4).

24.     Whether an agency action is "significant" enough to require preparation of an EIS involves "considerations of both context and intensity." 40 C.F.R. § 1508.27. The context of the action includes factors such as "society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of impact" and requires BLM to consider several factors including: impacts of the action; unique characteristics of the geographic area; the degree to which the effects on the quality of the environment are likely to be highly controversial; the degree to which the effects on the environment are highly uncertain or involve unknown risks; the degree to which the action may have a precedential effect; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; and the degree to which the action may have an adverse effect on endangered or threatened species or their critical habitat. 40 C.F.R. § 1508.27(b).

25.     Agencies may prepare an Environmental Assessment (EA) to determine whether a proposed action requires preparation of an EIS or warrants a finding of no significant impact.

26.     An EA must take a "hard look" at the potential consequences of agency actions and provide enough evidence and analysis for determining whether to prepare an EIS. Agencies must involve the public, to the extent practicable, in preparing this assessment. 40 C.F.R. § 1501.4(b).

27.     If the agency decides the impacts are not significant, it must supply a convincing statement of reasons why, and make its finding of no significant impact available to the public. 40 C.F.R. § 1501.4(e).

28.     A significant effect may exist even if the federal agency believes that, on balance, the effect will be beneficial. 40 C.F.R. § 1508.27(b)(1).

29.     Whether in an EA or EIS, an agency must adequately evaluate all potential environmental impacts of the proposed action. *See* 42 U.S.C. § 4332(2)(C). To meet this obligation, the federal agency must identify and disclose to the public all foreseeable impacts of the proposed action, including direct, indirect, and cumulative impacts. *See id*. § 4332(2); *see also* 40 C.F.R. §§ 1508.7, 1508.8.

30.     After preparing an EA or EIS, an agency may not simply rest on the original document. The agency must gather and evaluate new information that may alter the results of its original environmental analysis and continue to take a hard look at the environmental effects of its future planned actions. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 374 (1989) (noting that if "there remains 'major Federal actio[n]' left to occur," supplemental NEPA analysis is required if new information is significant).

31.     A Forest Service proposal is subject to NEPA requirements when all of the following apply: "(1) The Forest Service has a goal and is actively preparing to make a

Complaint

decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated (see 40 CFR 1508.23); (2) The proposed action is subject to Forest Service control and responsibility (see 40 CFR 1508.18); (3) The proposed action would cause effects on the natural and physical environment and the relationship of people with that environment (see 40 CFR 1508.14); and (4) the proposed action is not statutorily exempt from the requirements of section 102(2)(C) of the NEPA (42 U.S.C. 4332(2)(C))." 36 C.F.R. § 220.4.

32.     The Forest Service Regulations require an Environmental Assessment when (1) The Forest Service has a goal and is actively preparing to make a decision on more alternative means of accomplishing that goal and the effects can be meaningfully evaluated; (2) The proposed action is subject to Forest Service control and responsibility; (3) The proposed action would cause effects on the nature and physical environment and the relationship of people with that environment; and (4) The proposed rule is not statutorily exempt from the requirements of section 102(2)(C) of NEPA. 36 C.F.R. § 220.4(a), § 220.6, § 220.7.

33.     According to Council on Environmental Quality (CEQ) and USDA regulations, "[a]ll policies and programs of the various USDA agencies shall be planned, developed, and implemented so as to achieve the goals and to follow the procedures declared by NEPA in order to assure responsible stewardship of the environment for present and future generations." 7 C.F.R. § 1b.1.

**B.     The Forest Service's Wild Horse and Burro Manual.**

34.     The Forest Service's Wild Horse and Burro Manual states that "[p]articipation of a well-informed public in management of wild horses and burros is desirable." U.S. Forest Service, Forest Service Manual 2200, Range Management Chapter

8

Complaint

2260, Wild Free-Roaming Horses and Burros (2003) (hereinafter, Forest Service WHB Manual), § 2261.4.

35. The Forest Service WHB Manual requires the Forest Service to protect horses under its care and make agreements "to protect these animals." Forest Service WHB Manual, § 2264.1.

36. The Forest Service WHB Manual allows officers to place excess horses with qualified individuals, Government agencies, or other entities. A written maintenance and care agreement must accompany such relocation. Forest Service WHB Manual, § 2265.5.

37. The Forest Service WHB Manual requires the maintenance and care agreement to provide: (1) humane treatment and care of the horses; (2) prevention of sale of the horses; (3) prevention of transfer or assignment of the horse to a third party without approval of the Forest Service; (4) domestication; (5) possible gelding of stallions; (6) ownership of foals born during the time the horses are in the custody of private parties; (7) submission of periodic reports to the Forest Service; (8) prohibiting financial remuneration from carcasses of horses; (9) notification, within at least 7 days, of the death of an adopted animal; and (10) transfer of ownership (granting of title) at the end of one year of humane care and maintenance. Forest Service WHB Manual, § 2265.5.

38. The Forest Service grants title to an applicant when (1) the applicant has provided the animal maintenance and care under humane conditions for at least 1 year; (2) the application for title includes a written statement by a licensed veterinarian attesting to the present condition and treatment of the animal, unless waived in writing; and (3) the applicant is of legal age. Forest Service WHB Manual, § 2265.56.

39. According to the Forest Service WHB manual, "[a]nimals not placed under care and maintenance agreements to qualified individuals within 45 days following capture may be destroyed in the most humane and cost-effective manner possible." A reasonable

Complaint

attempt must be made to establish demand for these animals before destroying them. Forest Service WHB Manual, § 2265.62.

40.     The Forest Service WHB Manual requires an identification process, including a number assignment, for horses placed in private care. Forest Service WHB Manual, §§ 2265.51; 2265.52.

41.     The Forest Service charges individuals a non-refundable $25 payment for an adoption application. Forest Service WHB Manual, § 2265.54.

42.     The Forest Service WHB Manual does not specifically address the sale of horses with or without limitations.

43.     The Forest Service WHB Manual specifically states that Wild Horse Territory plans "shall include a section on management of the animals, addressing such items as population level, special consultation and coordination considerations, and plans for the removal or disposal of excess animals." Forest Service WHB Manual, § 2263.1.

44.     Improper application of an agency's own handbook means that the agency did not adequately explain its result. *Town of Barnstable v. FAA*, 659 F.3d 28, 34-36 (D.C. Cir. 2011).

45.     When an agency changes its policy, it must: (1) display awareness that it is changing position; (2) show that the new policy is permissible under the statute; (3) believe the  new policy is better; and (4) provide good reasons for the new policy. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)).

46.     The Modoc National Forest's Request to Purchase Wild Horses with Limitations application includes a series of questions that allows the Forest Service to evaluate whether the applicant is qualified to purchase the horses.

Complaint

47.     The Modoc National Forest's Request to Purchase Wild Horses with Limitations application requires applicants to certify that they will provide humane care for the horses, not sell or transfer the horses, and not violate the California Penal Code.

48.     The California Penal Code states that "it is unlawful for any person to possess, to import into or export from the state, or to sell, buy, give away, hold, or accept any horse with the intent of killing, or having another kill, that horse, if that person knows or should have known that any part of that horse will be used for human consumption." California Penal Code § 598c.

## FACTUAL BACKGROUND

**A.     The Devil's Garden Plateau Wild Horse Territory.**

**1.     Overview.**

49.     The Devil's Garden Plateau WHT is located beginning approximately seven miles north of the city of Alturas, California.

50.     The primary vegetation within the WHT includes juniper woodlands interspersed with sagebrush and grass flats.

51.     Historically, wild horses have roamed freely on the Devil's Garden Plateau for more than 140 years.

52.     The Devil's Garden Plateau WHT is managed by both Modoc National Forest and the Bureau of Land Management (BLM). An April 2013 Memorandum of Understanding (MOU) between Modoc National Forest and BLM defines the roles and responsibilities of each agency in relation to the management of wild horses in the WHT and designates the Modoc National Forest as the lead agency for the administration of the wild horse program in the territory, including BLM public lands therein. This administration includes the determination, validation, and adjustment of the appropriate management levels (AMLs) and development of the Devil's Garden Plateau Wild Horse Territory Management Plan

Complaint

(TMP). BLM's responsibility is to provide Modoc National Forest with population, resource and inventory data as it is collected from public lands, and to assist Modoc National Forest in carrying out its role as lead agency.

53.     Following the passage of the 1971 WHBA, in 1974, the Forest Service inventoried the Devil's Garden Plateau wild horses for the first time.

54.     The 1991 Modoc National Forest Land and Resource Management Plan (1991 Forest Plan) established an AML as a population range of 275 to 335 wild horses and allocated 4,400 animal unit months (AUMs) of forage for wild horse use.

55.     In the 2008 Record of Decision for BLM's Alturas Resource Management Plan, BLM elected not to set a separate AML for their public lands, and to instead cooperate with the Forest Service in the periodic removal, adoptions, and holding of animals.

56.     In January 2013, the *Evaluation of Monitoring Data for the Purpose of Determining an Appropriate Management Level* for the Devil's Garden Plateau WHT was completed by the Modoc National Forest. It was determined that the upper limit of AML would be established as 402 adult wild horses, or 5,789 AUMs, and the lower limit would be established as 206 adult wild horses.

57.     An aerial census conducted in February 2013 determined that the estimated population of wild horses in and around the Devil's Garden Plateau WHT was approximately 1,260 adult wild horses. Of these, 256 were found outside the designated boundary.

58.     In February 2016, Modoc National Forest personnel completed a "Double Count" aerial survey of the wild horse population in and around the Devil's Garden Plateau WHT and determined that the population was approximately 2,246 adult wild horses both within and outside the WHT. From that survey, it was estimated that Emigrant Springs

Complaint

Unit (including BLM Round Mountain HMA) had a population of 585 wild horses and Pine Springs Unit had a population of 437 wild horses.

59.     Based upon the February 2016 inventory, and assuming a 20 percent recruitment rate, the Forest Service estimates that the 2018 wild horse population for the Devil's Garden Plateau WHT is 3,881 wild horses, including the Emigrant Springs unit estimated at 1,011 wild horses and Pine Springs unit estimated at 755 wild horses.

60.     All or a portion of eleven grazing allotments managed by the Devil's Garden and Doublehead Ranger Districts of the Modoc National Forest lie within the WHT. Because the area contains large amounts of forage, the area is used heavily for grazing cattle.

### 2.     Previous Litigation—Boundaries.

61.     In 1975, the Forest Service issued its first Devil's Garden Plateau WHT Plan. The Plan specified that the area consisted of two separate areas of land totaling approximately 236,000 acres. The WHT did not include a 23,631-acre parcel of land, known as the Middle Section, which conjoined the two separate tracts.

62.     At some point in the 1980s, the Forest Service map added the Middle Section, and as a result, the two separate tracts were linked into a larger and unified WHT of approximately 258,000 acres.

63.     In 1991, the Forest Service issued the Forest Plan which acknowledged that the Forest Service was legally obligated to manage horses "within a 258,000-acre wild horse territory" and announced that "[t]he Forest has one wild horse territory of about 258,000 acres." Over the next two decades, the Forest Service continued to describe the WHT as a single contiguous area and continued to manage wild horses in the Middle Section.

64.     In August 2013, the Forest Service issued its Final Devil's Garden Plateau WHT Environmental Assessment (2013 EA) and declared the expansion reflected in the

Complaint

1980s map to be an "administrative error." As a result, the Forest Service redrew the territory's lines to exclude the Middle Section. At the same time, the Forest Service issued its new Devil's Garden WHT Management Plan indicating that the boundaries of the WHT would mirror those in the 1975 WHT Plan, which did not include the Middle Section.

65.     In response, environmental groups filed suit. On appeal, the United States Court of Appeals for the District of Columbia Circuit vacated the Forest Service's exclusion of the Middle Section territory and the related Finding of No Significant Impact and directed the district court to remand to the Forest Service for further consideration. *See Am. Wild Horse Pres. Campaign v. Purdue*, 873 F.3d 914 (D.C. Cir. 2017).

66.     On November 7, 2017, Plaintiffs' attorney in the case sent a letter to Modoc National Forest requesting that it allow wild horses to have full access to the Middle Section. On November 29, 2017, Modoc National Forest responded that it "would be in compliance with the Court order to manage the Devil's Garden Wild Horses Territory to include the 'Middle Section' and that certain components of the Devil's Garden Plateau Wild Horse [Territory Management Plan] and Forest Plan Amendments Decision Notice and [Finding of No Significant Impact] (August 27, 2013) now apply to the 'Middle Section.'"

67.     Despite the inclusion of the Middle Section, Modoc National Forest declined to conduct any additional environmental analyses before its planned 2018/2019 roundups. Instead, in July 2018, the Forest Service released a Supplemental Information Report (SIR) for the Devil's Garden Plateau WHT.

**B.     The 2013 Devil's Garden Plateau Wild Horse Territory Management Plan.**

68.     The 2013 Devil's Gard Plateau Wild Horse Territory Management Plan (TMP) directs management of wild horses in the Devil's Garden Plateau WHT for the next 15 to 20 years

69.     The August 2013 TMP established an AML of 206 to 402 adult wild horses.

70.     The TMP established that wild horses would be managed to achieve a 50:50 ratio between males and females by returning more males then females.

71.     The TMP further established that, to maintain the phenotype of wild horse that currently occur within the WHT, horses that are returned to the WHT will possess the general characteristics found in each home range (East, Middle, and West Home Ranges), and returned wild horses will generally be horses from 6 to 10+ years old, for which little adoption demand exists. Additionally, genetic diversity must be maintained at an Observed Heterozygosity (Ho) of at least 0.66. Notably, as of 2013, no studies had been conducted in the Devil's Garden Plateau WHT to determine the genetic health of the wild horses in the area.

72.     The activities proposed in the TMP were analyzed in an EA, Decision Notice, and Finding of No Significant Impact signed on August 27, 2013 by Kimberly H. Anderson, Forest Supervisor of Modoc National Forest at the time of the decision.

**C.     The August 2013 Devil's Garden Plateau Wild Horse Territory Management Plan Environmental Assessment.**

73.     The primary goal of the 2013 EA was to implement the TMP.

74.     According to the 2013 EA, the Proposed Action alternative included: (1) establishing the AML as a population range of 206 to 402 wild horses; (2) when necessary, roundups to remove wild horses from within and outside the WHT, beginning with annual roundups until AML is attained; and (3) once AML is achieved, population suppression methods would be implemented, including using fertility control and adjusting sex ratios to 50:50 or slightly in favor of males (60:40).

75.     According to the 2013 EA, the WHT comprises approximately 232,520 acres of federal land. Of this, 224,888 acres (97 percent) is National Forest System lands administered by the Modoc National Forest's Devil's Garden and Doublehead Ranger

Complaint

Districts and 7,632 acres (3 percent) is public land administered by the BLM's Alturas Field Office. Another 800 acres of Tribal lands, 640 acres of State lands, and 500 acres of private lands are excluded from the WHT.

76.     The 2013 EA did not analyze the 23,631-acre Middle Section.

77.      According to the 2013 EA, the Proposed Action includes non-significant amendments as defined under the National Forest Management Act (NFMA) to the 1991 Forest Plan. The non-significant amendments are required to be site-specific and apply only to the WHT.

78.     According to the Finding of No Significant Impact associated with the 2013 EA, the Forest Service decided to implement the Proposed Action (Alternative 2) with modifications, including that the "[d]isposition of older animals that are gathered will be consistent with law, regulations and policy. This change is made to insure compliance with the 1971 [WHBA], as amended."

79.     The components of the Proposed Action include: (1) approval of the TMP; (2) designation of the Modoc National Forest as the lead agency for management actions related to wild horses; (3) adoption of the non-significant Forest Plan amendments, including revising the herd management plan for the Devil's Garden Plateau WHT every ten to twenty years and evaluating the AML as part of that decision process and establishing a boundary that is consistent with the herd's known territorial limits and provides for two distinct home ranges; (4) establishment of the AML range of 206 to 402 adult wild horses; (5) use of helicopters as the primary method of rounding up wild horses; (6) commencing roundups as soon as possible; (7) removing horses outside the WHT first; (8) implementing fertility control; (9) establishing a baseline for genetic diversity through sampling; (10) sex ratio adjustments to 50:50; (11) assessing the feasibility of developing additional water sources; (12) no new fencing, but reconstructing existing

Complaint

allotment/pasture fencing; (13) leaving gates open when livestock are absent; and (14) population and habitat monitoring.

80.     According to the 2013 EA, the Forest Supervisor of the Modoc National Forest is the deciding official. The deciding official selects the management strategy for the Devil's Garden Plateau wild horse herd and their habitat, including decisions regarding: (1) whether or not to amend the Forest Plan; (2) the AML; (3) techniques to maintain or improve the genetic health of the wild horses; (4) population suppression methods; (5) the frequency of roundups and removals; (6) the criteria used to determine whether horses are excess; (7) the methods to be used to roundup and remove wild horses; and (8) the habitat projects that would be implemented.

81.     The 2013 EA specifically states that wild horses removed for the WHT would be placed as follows: (1) "The first priority would be to place excess wild horses in private care through adoption or sale to qualified individuals. Authorized agency personnel would be responsible for adoption compliance and title transfer of these animals."; (2) "The second priority would be to place excess animals that are not adopted or sold in approved long-term holding pastures or sanctuaries. Authorized agency personnel would be responsible for ensuring the animals are cared for in a safe and humane manner."

82.     The 2013 EA does not discuss, analyze, or give any indication that wild horses removed from the Devil's Garden Plateau WHT would be sold without limitations or that the wild horses could be sold to slaughter.

**D.     The Supplemental Information Report for the Devil's Garden Plateau Wild Horse Territory Environmental Assessment, Decision Notice, and Management Plan.**

83.      In July 2018, the Forest Service release the SIR in order to provide updated and current information on the WHT as well as a review of the 2013 EA to determine whether it needs to be supplemented prior to on-the ground roundup activities.

Complaint

84.     According to the SIR, "Forest Service planning directives state that a project-level NEPA-based decision remains valid as long as the authorized activity complies with laws, regulations, forest plan, and is within the scope of the project-level NEPA-based decision. Therefore, it is not necessary to initiate a new site-specific analysis in order to undertake a modification that has already been analyzed, decided upon, and documented."

85.     According to the SIR, the establishment of the boundary for the WHT "was remanded and will be re-analyzed at a late date."

86.     According to the SIR, in 2018, it is estimated that 4,181 wild horses would need to be removed to reach the 206 AML lower limit.

87.     According to the SIR, the 2018/2019 planned roundup are for wild horses outside the WHT and inside the Emigrant Springs and Pine Springs units. The Middle Section of the WHT that was not analyzed in the 2013 EA would not be part of the upcoming roundup.

88.     According to the SIR, "new information does not require a change to the TMP management actions or established AML." Thus, the proposed 2018/2019 roundups "would not change the analysis from the 2013 EA" and "[t]here would be no significant impact as a result of the proposed" roundups.

89.     According to the SIR, "a SIR is not a NEPA document and cannot be used to fulfill the requirements for a supplemental EA." However, "[s]pecialists for each identified resource area have reviewed the new information or changed circumstances and have verified that the original 2013 EA analysis and disclosure regarding environmental effect is sufficient." Therefore, "[n]o additional analyses are needed at this time."

90.     The SIR does not include any information or analysis regarding the Forest Service's plan to sell the horses removed during the 2018/2019 roundup without limitations or the Forest Service's change in policy.

18

Complaint

91.    The Modoc National Forest Service began rounding up 1,000 of the estimated 3,900 wild horses from the Devil's Garden Plateau WHT on October 10, 2018. As of October 20, 2018, 422 wild horses have been rounded up from the area.

**E.    The Forest Service's New Policy to Sell Wild Horses Without Limitations.**

92.    The American public has generally not supported the destruction, killing, or slaughter of wild horses. A 2017 survey showed that more than 70 percent of the respondents did not support the slaughter of wild horses.

93.    Beginning in 2014, USFS and BLM mutually agreed without any public participation to discontinue delivery of Forest Service horses or burros into BLM's off-range long-term holding facilities.

94.    This decision was made after it was discovered that from 2008 to 2012, BLM had allowed the sale of approximately 1,700 wild horses that resulted in the wild horses being sent to slaughter for processing into commercial products.

95.    According to a Department of the Interior Office of Inspector General's October 23, 2015 report, the purchaser of these horses said that he purchased horses from BLM by the truckload, which typically consisted of 35 horses, and paid $10 per horse. He said he could sell a load of 35 horses for about $3,500 to $4,000 and make $2,500 to $3,000 in profit on each sale. He also said that if he could obtain more horses, he would have taken them directly to Mexico himself because he could sell them for $100 each there.

96.    To prevent this from occurring, when wild horses removed from Forest Service lands are offered for adoption or sale, the Forest Service has typically placed strict limitations on all sales and adoptions. Moreover, the Forest Service has adhered to the

Complaint

Department of the Interior's policy which prohibits selling wild horses to slaughterhouses.

97.     According to the Forest Service, the new Administration is changing that policy.

98.     According to the Modoc National Forest, following the 2018/2019 roundups, a total of approximately 700 horses will be made available for adoption through the BLM.

99.     According to the Modoc National Forest, following the 2018/2019 roundups, approximately 300 of the older, less-adoptable horses may be subject to sale without limitations.

100.    According to Forest Service spokesman Ken Sandusky, wild horses that are at least ten years old will be put up for sale without limitation for one dollar apiece if they are not adopted within 30 days. Mr. Sandusky noted that an estimated 300 wild horses may be sold without limitations.

101.    According to a Forest Service blog post, last accessed on October 11, 2018, horses will be available for adoption for $125 or sale with limitations for $25. After 30 days, sale without limitation will begin and buyers can purchase up to 36 horses for on dollar apiece. The blog post specifically states that the horses can be sold to buyers that may send them to slaughter.

102.    Buyers who purchase wild horses sold without limitations are not subject to the same scrutiny as buyers who purchase wild horses sold with limitations.

103.    Wild horses sold without limitations could potentially be sold to slaughterhouses across the world.

104.    Although California state law prohibits selling horses for human consumption, the Forest Service still plans to go forward with the plan to sell horses without limitations.

105.    Wild horses sold without limitations could potentially be sold to

Complaint

slaughterhouses that will produce products for human consumption.

106.     The Forest Service did not issue a new EA or a supplemental EA addressing this change in regards to the Devil's Garden Plateau wild horses.

107.     On October 12, 2018, Modoc National Forest and Pacific Southwest Region of the USDA Forest Service extended the timeline for wild horses to be adopted or sold with limitations to a total of 90 days from when the gather started on October 10, 2018. According to the press release, it will take 30 days to roundup and process 1,000 horses and the adoption and sale period will run for 60 days after that, and horses that do not get adopted will be offered for limited sale.

108.     On October 16, 2018, Modoc National Forest and Pacific Southwest Region of the USDA Forest Service issued another press release stating that, in response to concerns about wild horses being sold without limitations, captured wild horses more than ten years old would now be offered for adoption and sales with limitations for a minimum of 60 days after their veterinary care and preparation is complete, or no earlier than January 10, 2019. After 60 days, any horses not adopted or sold with limitation would be sold without limitations.

109.     United States Senator Dianne Feinstein called on the Forest Service to halt the planned roundup out of concern that hundreds of wild horses could be sold to slaughterhouses.

110.     To the best of Friends of Animals' knowledge, the Forest Service has never issued a formal policy informing the public that it intends to change its previous policy in order to allow sale without limitations.

## CLAIMS
### FIRST CAUSE OF ACTION
### (NEPA)

111.     Friends of Animals herein incorporates all allegations contained in the

21

Complaint

preceding paragraphs.

112.     The Forest Service failed to issue any new or supplemental environmental analyses regarding the Devil's Garden Plateau wild horses following its 2014 decision to discontinue delivery of Forest Service horses into BLM's off-range long-term holding facilities.

113.     The Forest Service failed to issue any new or supplemental environmental analyses regarding the Devil's Garden Plateau wild horses following its new policy to sell without limitations wild horses rounded up and removed by the Forest Service, including the wild horses rounded up and removed from Devil's Garden Plateau WHT in 2018/2019.

114.     The Forest Service failed to issue any new or supplemental environmental analyses following its new policy to sell without limitations wild horses rounded up and removed by the Forest Service, including the wild horses rounded up and removed from Devil's Garden Plateau WHT in 2018/2019, despite the new information and changed conditions that directly affected the planned 2018/2019 roundups.

115.     Because the Forest Service never contemplated sale without limitations at any time before issuing the 2013 EA, none of the Forest Service's analyses in the 2013 EA involved consideration of any of the CEQ significance factors.

116.     Defendants failed to explain or even address the new policy in any documents leading up to the 2018/2019 roundups.

117.     Defendants failed inform the public of its new policy to sell without limitations the wild horses removed from Devil's Garden Plateau WHT in 2018/2019 and thereby failed to engage in informed decision making and provide for meaningful public input as required by NEPA.

118.     Defendants failed to explain or even address the new policy in any documents whatsoever, including in the 2018 Supplemental Information Report.

Complaint

119.     Because this new information was not sufficiently analyzed in the 2013 EA

and the Forest Service did not issue any new or supplemental environmental analyses, the

Forest Service's decision to sell wild horses without limitations is arbitrary and capricious,

an abuse of discretion, and not in accordance with law or procedure, and must be set aside

under the Administrative Procedure Act, 5 U.S.C. § 706.


## SECOND CAUSE OF ACTION
### (NEPA)

120.     Friends of Animals herein incorporates all allegations contained in the

preceding paragraphs.

121.     Following the vacatur and remand of the 2013 EA in 2017, the Forest Service

failed to conduct new environmental analyses addressing the inclusion of the 23,631-acre

Middle Section in the Devil's Garden Plateau WHT.

122.     Following the vacatur and remand of the 2013 EA, the Forest Service failed to

issue new environmental analyses for the Devil's Garden Plateau WHT to address the

inclusion of the 23,631-acre Middle Section in the Devil's Garden Plateau WHT.

123.     The implementation of the Proposed Action analyzed in the 2013 EA, an

action that did not analyze the inclusion of the 23,631-acre Middle Section and the new

information regarding selling without limitations the wild horses removed during the

2018/2019 roundups, constitutes a major federal action that will significantly affect the

quality of the human environment, and therefore an Environmental Impact Statement is

required under NEPA.

124.     The implementation of the Proposed Action analyzed in the 2013 EA, an

action that did not analyze the inclusion of the 23,631-acre Middle Section and the new

information regarding selling without limitations the wild horses removed during the

Complaint

2018/2019 roundups, is highly controversial, highly uncertain, involves unique and unknown risks that have never been analyzed, and may have a severe precedential effect.

125.    Defendants failed to adequately analyze the inclusion of the 23,631-acre Middle Section in the Supplemental Information Report.

126.    Defendants failed to consider vital intensity considerations.

127.    Defendants failed to address its new policy to sell horses without limitations in the Supplemental Information Report.

128.    Therefore, in deciding to go forward with the roundup and subsequent sale without limitations without an Environmental Impact Statement, Defendants actions are arbitrary, capricious, an abuse of discretion, and not in accordance with the law or required procedure and should be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

## THIRD CAUSE OF ACTION
### (Departing from Internal Guidance Without Explanation)

129.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

130.    Forest Service policy mandates that Wild Horse Territory plans "shall include a section on management of the animals, addressing such items as population level, special consultation and coordination considerations, and plans for the removal or disposal of excess animals."

131.    The Devil's Garden Plateau TMP does not include a section concerning selling with or without limitations wild horses removed from Devil's Garden Plateau WHT.

132.    Defendants failure to follow its own policies, without explanation, is arbitrary and capricious, an abuse of discretion, and not in accordance with law or required procedures, and must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

## REQUEST FOR RELIEF

24

Complaint

Friends of Animals respectfully requests that this Court enter judgment providing the following relief:

A. Declare that the Defendants actions in going forward with the 2018/2019 roundups without further environmental review were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and without the observance of procedure required by law in violation of the Administrative Procedure Act;

B. Vacate Defendants decision to sell wild horses without limitations;

C. Enjoin the Forest Service from moving forward with future roundups pursuant to its 2013 EA, Decision Notice, and Finding of No Significant Impact until such time as the Forest Service has complied with the law;

D. Enjoin the Forest Service from selling any wild horses pursuant to the new policy until such time as the Forest Service has complied with the law;

E. Award Plaintiff reasonable costs, litigation expenses, and attorney fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq., and/or all other applicable authorities; and/or

F. Grant such further relief as the Court deems just and equitable.


Dated:  October 22, 2018                    Respectfully submitted,

                                            /s/ Michael Ray Harris
                                            Michael Ray Harris (DC Bar # CO0049)
                                            Director

                                            /s/ Courtney McVean
                                            Courtney McVean (DC Bar # CO0064)
                                            Associate Attorney

                                            Friends of Animals
                                            Western Region Office
                                            7500 E. Arapahoe Road, Suite 385
                                            Centennial, CO 80112
                                            (720) 949-7791
                                            michaelharris@friendsofanimals.org
                                            courtney.mcvean@friendsofanimals.org

                                            *Attorneys for Plaintiff*

Complaint

Complaint